[Cite as *Gillespie v. Waterwheel Farms, Inc.*, 2018-Ohio-1535.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MIAMI COUNTY**

| | | |
|---|---|---|
| TED GILLESPIE | : | |
| | : | |
| Plaintiff-Appellant | : | Appellate Case No. 2017-CA-16 |
| | : | |
| v. | : | Trial Court Case No. 16-CV-231 |
| | : | |
| WATERWHEEL FARMS, INC., et al. | : | (Civil Appeal from |
| | : | Common Pleas Court) |
| Defendants-Appellees | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 20th day of April, 2018.

. . . . . . . . . . .

DAVID E. DAVIDSON, Atty. Reg. No. 0016543, 50 East Rivercenter Blvd. Suite 1400, Covington, Kentucky 41011
      Attorney for Plaintiff-Appellant

JAMES D. UTRECHT, Atty. Reg. No. 0015000, 12 S. Plum Street, Troy, Ohio 45373
      Attorney for Defendant-Appellee

. . . . . . . . . . . . .

HALL, J.

{¶ 1} Ted Gillespie appeals from the trial court's entry of summary judgment against him on his complaint against appellees Waterwheel Farms, Inc., Paul D. Thies, and Richard Thies for damages he sustained as a result of being bitten by a dog.

{¶ 2} In his sole assignment of error, Gillespie contends the trial court erred in entering judgment against him as a matter of law on a strict-liability claim under R.C. 955.28(B).

{¶ 3} The record reflects that Gillespie, a delivery driver, was bitten while completing a delivery to the appellees' farm. His complaint included causes of action based on common-law negligence and strict liability under R.C. 955.28(B). In a May 3, 2017 ruling, the trial court entered partial summary judgment against Gillespie, resolving only his statutory claim. Thereafter, on July 14, 2017, the trial court entered summary judgment against him on his remaining common-law claim.

{¶ 4} With respect to Gillespie's statutory claim, which is the sole subject of his appeal, the trial court made the following factual findings:

Plaintiff was bitten by a dog owned by the Defendants on or about June 2, 2014. The incident occurred at the Defendants' grain farm located at State Route 48, Union, Miami County, Ohio. The Defendants kept dogs in the machine shop located on the farm to deter nighttime burglaries. Plaintiff was delivering a load of anhydrous ammonia when the incident occurred. This was the first time Plaintiff had been on Defendants' property. When the Plaintiff arrived, he was met by a "hired hand" who told him that he would be there when Plaintiff finished delivering his load to help guide

Plaintiff's truck off of the property.

After the Plaintiff delivered the load of anhydrous ammonia, he entered a building on the property to obtain a signature on a Bill of Lading from the hired hand. The Plaintiff made his way to the machine shop through a small vestibule that was not lighted. Defendants had placed a handwritten warning sign on the shop door which indicated "DO NOT Enter Shop Without Permission. Dogs on Duty!" Plaintiff maintains that he did not see the warning sign, nor did he see or hear the dogs before opening the door. Plaintiff does not claim, nor is there any evidence to suggest that Plaintiff was given permission to enter the building or the machine shop located inside a separately secured room in the building.

(Doc. #26 at 1-2).

{¶ 5} Based on the foregoing facts, the trial court found the appellees entitled to summary judgment on Gillespie's statutory claim. Specifically, it determined that he was committing criminal trespass, as a matter of law, when he opened the shop door and immediately was bitten on the face by one of the dogs. Therefore, the trial court found applicable a criminal-trespass affirmative defense to strict liability under R.C. 955.28(B). In support of its decision, the trial court reasoned:

The Court finds that, even when construing the evidence most favorably to the Plaintiff, that there are no issues of genuine fact and that the Defendants are entitled to a judgment as a matter of law because the Plaintiff was trespassing when he opened the door and entered the Defendants' building without permission and he remained a trespasser as

he walked through the vestibule and opened the shop door with the posted warning sign. At no time did the Defendants or their agents instruct nor invite the Plaintiff to enter the building or the separately secured shop. The Plaintiff was a trespasser as a matter of law. It is immaterial that Plaintiff claims he did not see the warning sign on the shop door. He had no right, implied or direct, to enter the building through a closed door or to attempt to enter the separately secured shop. Because Plaintiff was a trespasser, the Defendants owed him no duty and they have proved the affirmative defense available under the statute.

To find otherwise would in effect work as a judicial permission slip to all delivery personnel. Can a delivery person walk through an open garage, open a door and walk into someone's kitchen because they want to obtain a signature for a package, the answer is NO.

Defendant's building was clearly delineated and moreover, it was secured when Plaintiff began searching for a door to gain access. His first attempt to access the building found a "locked door." It is undisputed that the door through which he gained access was "closed," as was the shop door where the dogs were located.

Plaintiff does not argue, for good reason, that the "hired hand" gave him permission to enter the building or the shop when he told him that he would "be there" when Plaintiff finished his delivery "to help guide his truck." "There" meant outside the building where Plaintiff's truck was located. At no time did Defendants' hired hand invite or even imply that the Plaintiff could

come inside the building or the shop once he was done with his delivery. In fact, the hired hand did not tell Plaintiff where he was going and the Plaintiff admits that he had no idea where he went. Nevertheless, the Plaintiff took it upon himself to enter the building and the shop without permission in an effort to find the hired hand. The Court also notes that the Plaintiff had been trained to leave the Bill of Lading, unsigned, in a mailbox or other location in the event that a signature could not be obtained. The Plaintiff chose to ignore his training and trespassed into Defendants' secured building and separately secured shop.

As an aside, the Court has reviewed Defendants' Exhibits D-1 through D-17, which are photographs of the shop door and warning sign, and finds Plaintiff's deposition testimony lacking credibility as it relates to his position that he did not see the sign. The sign is large and was hung at eye level. Although not material to the Court's decision, the Court finds Plaintiff's deposition testimony to lack credibility on this issue.

(Doc. #26 at 6-8, footnotes omitted).

{¶ 6} On appeal, Gillespie contends the trial court erred by failing to construe the evidence most strongly in his favor and by misapplying R.C. 955.28(B). Relying on his own deposition testimony, Gillespie asserts that he never reached the shop where the warning sign was posted, that he would not have seen the sign anyway, and that the sign did not provide fair warning due to darkness in the building. With regard to the statute, Gillespie argues that he remained an invitee, not a criminal trespasser, when he encountered the dog that bit him. He argues that the only door he entered led to a

business office, which he was trying to locate to get his paperwork signed. Based on that premise, he maintains that the criminal-trespass affirmative defense did not apply. At a minimum, Gillespie asserts that his deposition testimony raises genuine issues of material fact for trial.

{¶ 7} Under Civ.R. 56, a trial court may enter summary judgment for the moving party "if there are no genuine issues of material fact remaining to be litigated, the moving party is entitled to judgment as a matter of law, and reasonable minds can come to only one conclusion, and that conclusion is adverse to the nonmoving party, who is entitled to have the evidence construed most strongly in his favor." (Citation omitted.) *Smith v. Five Rivers MetroParks*, 134 Ohio App.3d 754, 760, 732 N.E.2d 422 (2d Dist.1999). "We review summary judgment decisions de novo, which means that we apply the same standards as the trial court." (Citations omitted.) *GNFH, Inc. v. W. Am. Ins. Co.*, 172 Ohio App.3d 127, 2007-Ohio-2722, 873 N.E.2d 345, ¶ 16 (2d Dist.).

{¶ 8} Having reviewed the record, we conclude that the trial court erred in entering summary judgment against Gillespie on his claim under R.C. 955.28(B), which states in relevant part: "The owner, keeper, or harborer of a dog is liable in damages for any injury * * * that is caused by the dog, unless the injury * * * was caused to * * * an individual who, at the time, was committing or attempting to commit criminal trespass[.]" The trial court correctly recognized that the statute imposes strict liability subject to a criminal-trespass affirmative defense.[1] *Beckett v. Warren*, 124 Ohio St.3d 256, 2010-Ohio-4, 921 N.E.2d

---

[1] Under a prior version of the statute, uncertainty existed about whether civil trespass was sufficient to trigger the affirmative defense. *See, e.g., Prather v. Whitaker*, 2d Dist. Montgomery No. 17972, 2000 WL 331802, *4 (March 31, 2000). Effective September 30, 2008, the General Assembly modified the statute to its current form, which limits the affirmative defense to criminal trespass.

624, ¶ 10. Under R.C. 2911.21(A)(1), a criminal trespass occurs when a person, without privilege, knowingly enters or remains on the land or premises of another.[2] Under R.C. 2901.01(A)(12), "privilege" is defined as "an immunity, license, or right conferred by law, bestowed by express or implied grant, arising out of status, position, office, or relationship, or growing out of necessity."

{¶ 9} Gillespie was not a trespasser when he arrived at the appellees' farm and began filling their tank with anhydrous ammonia. Appellee Paul Thies admitted in his deposition that he orders anhydrous ammonia and asks for it to be delivered to the farm. (Thies depo. at 42). Therefore, Gillespie had the status of an "invitee" when he delivered the anhydrous ammonia on the occasion in question. "Invitees are persons who rightfully come upon the premises of another by invitation, express or implied, for some purpose which is beneficial to the owner." *Gladon v. Greater Cleveland Regional Transit Auth.*, 75 Ohio St.3d 312, 315, 662 N.E.2d 287 (1996). However, an invitee's status "is limited by the landowner's invitation." *Id.* A person " 'has the status of an invitee only while he is on the part of the land to which his invitation extends—or in other words, the part of the land upon which the possessor gives him reason to believe that his presence is desired for the purpose for which he has come.' " *Id.*, quoting 2 Restatement of the Law 2d, Torts (1965), 181-182, Section 332, Comment I. " 'If the invitee goes outside of the area of his invitation, he becomes a trespasser or a licensee, depending upon whether he goes there without the consent of the possessor, or with such consent.' " *Id.* "The test for considering the scope of the invitation is objective and depends upon how a reasonable person would

---

[2] Although the statute also sets forth other ways in which a criminal trespass can occur, the trial court found R.C. 2911.21(A)(1) applicable here. (See Doc. #26 at 5).

interpret the purpose for which the land is held open and for which the possessor desires persons to enter." *Wanko v. Downie Productions, Inc.*, 10th Dist. Franklin No. 99AP-1047, 2000 WL 1199235, *3 (Aug. 24, 2000), citing *Conniff v. Waterland, Inc.*, 118 Ohio App.3d 647, 651, 693 N.E.2d 1127 (11th Dist.1997). "Relevant considerations include the possessor's conduct, the nature of the business conducted on the premises, and the arrangement and design of the premises." *Id.*

{¶ 10} In his deposition, Gillespie testified that he arrived at the farm around 7:00 p.m. or 7:30 p.m. on June 2, 2014. He spoke with a "hired hand" for about thirty minutes while waiting for the worker to fill a "nurse tank," which was blocking Gillespie's access to a main holding tank that he was to fill with the anhydrous ammonia. (Gillespie depo. at 55-58). At some point, another unidentified man approached and joined in the conversation. (*Id.* at 60). After filling the nurse tank, the employee moved out of the way. (*Id.* at 59-60). Gillespie proceeded with his work and did not see where either of the two men went. (*Id.* at 60, 64-65). He finished filling the holding tank at approximately 9:30 p.m. (*Id.* at 68). To complete his delivery, Gillespie was supposed to get a bill of lading signed. (*Id.* at 66). If no one was available, his employer permitted him to leave a copy in a mailbox. (*Id.* at 67).

{¶ 11} Gillespie did not see either of the two men when he finished his work, although the hired hand had said he would be back to help Gillespie maneuver his truck out. About sixty feet away from where he had been working, however, Gillespie observed a large metal building with a "huge" overhead door. (*Id.* at 66, 69). He also noticed a bright light being emitted around the outline of the door. (*Id.* at 66). It was getting dark outside, and Gillespie, who never had been to the farm before, suspected that the two men might

have gone inside the building. (*Id.* at 66, 68). He proceeded to walk toward the light in the building. He encountered a locked door on one side of the building, which he described as a "tool shed." (*Id.* at 66). He then saw a second door that was unlocked. Gillespie opened that exterior door and entered into a small, dark "vestibule." (*Id.* at 70-71, 76). He estimated that the vestibule was approximately "four foot by five foot" in size. Inside the vestibule, he saw a door to the left with a window. Light was coming through that window. (*Id.* at 71, 76). Gillespie opened that door and immediately was attacked by the appellees' dogs, one of which bit him on the face. (*Id.* at 71). Gillespie did not hear the dogs before the incident, and he did not see any sign in the window. (*Id.* at 71-73). Gillespie could not say whether the interior door he opened went to a shop or to an office, as he never actually passed through the door. (*Id.* at 74, 77). As he backed away and tried to shut the door, one of the dogs jumped up and bit his mouth. (*Id.* at 78-79).

{¶ 12} In his deposition testimony, appellee Paul Thies described the building at issue as being approximately eighty feet by ninety feet in size. He referred to the building as a whole as a "shop" and explained that it was used to repair equipment. (Thies depo. at 15-16). The building also contained a business office, a lunchroom, a workshop, and a restroom. (*Id.* at 18, 38-39, 56-57). Thies agreed that the building fairly could be characterized as the farm's "principal place of business." (*Id.* at 18). He acknowledged that there "may" or "might" have been a sign on or near the exterior door leading into the building that said "office." (*Id.* at 39, 55-56). Upon entering the building, Thies believed there also was a sign on one of the interior doors that said "office" on it. (*Id.* at 38).

{¶ 13} Although he was not present at the farm when Gillespie was bitten, Thies testified that the dogs were kept inside the workshop at night and that there was a warning

sign on the workshop door about the dogs. (*Id.* at 57-60, 67). Thies testified that Gillespie would have been required to open *three* doors to get to the workshop where the dogs were kept. (*Id.* at 80). Specifically, he would have been required to open and enter the exterior door. He then would have been required to open the lunchroom door and go through the lunchroom before reaching the workshop door, which had the warning sign about the dogs. (*Id.* at 39, 49-51, 53-58).

{¶ 14} Construing the foregoing evidence most strongly in Gillespie's favor, we find genuine issues of material fact as to whether he remained an invitee at the time of his injury. After filling the appellees' holding tank, Gillespie looked for someone to sign a bill of lading. Although it was approximately 9:30 p.m., it was not beyond the farm's operating hours. Thies testified that the exterior doors to the building always were locked at night when the workers left the farm. (*Id.* at 47-48, 55). On this occasion, Thies' son and the hired hand remained working in a back field. (*Id.* at 62-65). As set forth above, Gillespie approached the building and opened an unlocked exterior door that Thies acknowledged "may" have had a sign on or near it saying "office."[3]

{¶ 15} Gillespie testified multiple times during his deposition that once inside the building he opened only *one* interior door and that he was bitten immediately upon opening it. In contrast to Gillespie's testimony, Thies testified that Gillespie would have been required to open a total of *three* doors before encountering the dogs behind the workshop door that had the warning sign. At least two competing inferences can be drawn

---

[3] Although Gillespie did not mention relying on a sign on the exterior door, the test for whether he remained an invitee "is objective and depends upon how a reasonable person would interpret the purpose for which the land is held open and for which the possessor desires persons to enter." *Wanko* at *3. Thus, the potential existence of an "office" sign on the exterior door is relevant to whether a reasonable person would open the door.

from this conflicting testimony. One inference is that Gillespie is mistaken about the number of doors he opened inside the building. Another inference is that the dogs were behind a door other than the workshop door. Thies testified that the dogs always were kept in the workshop "at night" to guard the property. (Thies depo. at 48, 60). He was not present on this occasion, however, and lacked first-hand knowledge about the dogs' location. Additionally, as noted above, the building's exterior door remained unlocked and workers remained in the fields. Under these circumstances, and particularly in light of Gillespie's insistence that he opened only one interior door, a trier of fact reasonably might conclude that the dogs were not in the workshop when he encountered them. And if the dogs were not in the workshop, then the warning sign on the workshop door would be irrelevant.[4]

{¶ 16} Gillespie testified that upon entering the small vestibule or hallway he promptly encountered a door to the left, which he opened and which had the dogs behind it. (Gillespie depo. at 70-71). According to Thies, however, Gillespie would have approached the workshop door not from the vestibule or hallway but from the lunchroom. (Thies depo. at 51). Thies testified that upon entering the building, a person would be in a hallway with an interior office door immediately to the right. (*Id.* at 49, 51). Although Gillespie recalled opening a door to the *left* upon entering the vestibule, Thies' testimony suggests that the only interior door immediately available in the vestibule or hallway was the office door on the *right*. Thus, it could be that the interior door Gillespie opened actually

---

[4] Parenthetically, even if Gillespie did open the workshop door, he testified that the vestibule where he stood was dark and that the only light was coming from the other side of the door. Under these circumstances, a trier of fact might conclude that the warning sign was not reasonably visible.

was the office door. At a minimum, we find genuine issues of material fact for trial. Taking into consideration the nature of the farm operation, the fact that the building housed the appellees' business office, the reason for Gillespie's presence, and the seemingly conflicting testimony about the location of the dogs, construing the evidence most favorably for Gillespie, we believe there are genuine issues of fact regarding whether Gillespie was an invitee or a criminal trespasser, when he was bitten by the appellees' dog.

{¶ 17} But even if Gillespie did not remain an invitee, a trier of fact reasonably could conclude that his status transformed into that of a licensee rather than a criminal trespasser. A licensee is "a person who enters the premises of another by permission or acquiescence, for his own pleasure or benefit, and not by invitation[.]" *Light v. Ohio University*, 28 Ohio St.3d 66, 68, 502 N.E.2d 611 (1986). "Whether one is a trespasser or a licensee is often difficult to determine and frequently turns upon the peculiar circumstances connected with the particular entry." *Keesecker v. G.M. McKelvey Co.*, 141 Ohio St. 162, 167, 47 N.E.2d 211 (1943).

{¶ 18} Although Gillespie was an invitee on the appellees' property for purposes of filling their holding tank, he arguably entered the building at issue for his own benefit to have someone sign a copy of the bill of lading. Even if this is true, a trier of fact reasonably could find that he did so with the appellees' implicit permission or acquiescence insofar as he entered a building that admittedly housed their farm office (and that may have exhibited an exterior sign designating it as the office) during working farm hours while farm employees remained on the property.

{¶ 19} In *Keesecker*, a deliveryman inadvertently delivered a package to the wrong

house. In doing so, he opened an unlocked door to an enclosed porch, entered the porch, and rang a doorbell. As he did so, a child fell from the porch and sustained injuries. In a resulting tort action against the deliveryman's employer, a key issue was whether the deliveryman was a trespasser or a licensee. The Ohio Supreme Court found a genuine issue of material fact, reasoning:

> In the pending litigation there is no dispute that the porch was enclosed. The evidence tends strongly to show that the porch contained furniture and that the door leading into it was shut. Moreover, the advent of any deliveryman from the McKelvey store was not anticipated by the Keeseckers during the afternoon in controversy.

> On the other hand, in this day and age it is a matter of general knowledge that deliverymen, tradespeople and others having business or prospective business with the occupants of a private dwelling, or being in quest of information, commonly call at the front door. In the present case the porch door was unlocked, there was no warning to stay out, a doorbell was located beside the inside door, and the deliveryman was of the honest belief that the package he carried was to be left at the Keesecker residence.

> Therefore, was the deliveryman guilty of an unauthorized or unlawful intrusion onto the porch, making him a trespasser, or was he confronted by appearances which would justify him in inferring that the owner or occupant had given tacit or implied assent to persons in a similar position to his to enter upon the porch and go to the other door for ordinary transactions, thus placing them in the category of licensees?

The rule is well established in this state that when the uncontradicted evidence discloses circumstances from which different minds may reasonably draw different conclusions, one favorable and the other unfavorable to the claim of a party, the evidence should be submitted to the jury under pertinent instructions. * * *

*Keesecker* at 167-168; *see also Clary v. McDonald*, 120 Ohio App. 8, 11-12, 200 N.E.2d 805 (4th Dist.1963), quoting 38 American Jurisprudence, 794, Section 133 (" 'It has been held that a person who visits a portion of a store not frequented by visitors, entirely on his own business, without the owner's invitation or knowledge, is a mere licensee[.]'").

**{¶ 20}** Although the facts of the present case differ from those of *Keesecker*, the critical inquiry is similar. Gillespie entered a closed but unlocked door despite the fact that the appellees argue they did not intend for him to do so. On the other hand, the appellees reasonably might anticipate a deliveryman such as Gillespie approaching a building that housed their business office during farming hours and opening unlocked doors in search of someone to sign his bill of lading. Under these circumstances, we believe the trial court erred in finding that Gillespie had committed criminal trespass as a matter of law.

**{¶ 21}** This court's opinion in *Prather v. Whitaker*, 2d Dist. Montgomery No. 17972, 2000 WL 331802 (March 31, 2000), upon which the appellees rely, is not to the contrary. In *Prather*, the plaintiff, a delivery driver, injured his ankle while being chased by the defendants' dog as he delivered a package to their home. The plaintiff initially took the package to the defendants' front door. After no one answered, he decided to place the package inside a fenced area. He did not recall seeing a no-trespassing sign on the fence or a lock on the gate, but he did not deny the existence of a sign. Upon stepping through

the gate, the plaintiff encountered a growling dog that bit his clipboard. The plaintiff ran away and injured his ankle. One of the defendants testified at trial that a no-trespassing sign was on the fence and a scissor lock was on the gate. The trial court granted the defendants a directed verdict on the basis of the trespass affirmative defense in R.C. 955.28(B).

{¶ 22} On appeal in *Prather*, this court recognized that the plaintiff had at least implied permission to enter the unfenced portion of the defendants' property to deliver the package. *Id.* at *2. This court reasoned, however, that the plaintiff had no permission to enter the area delimited by a six-foot high fence with a no-trespassing sign:

> We conclude that the Whitakers' use of a physical barrier, in conjunction with the use of a posted sign placed where a reasonable person would be able to see it, gave adequate warning of the intent to restrict access to the fenced-in area of the yard. Regardless of whether Prather's actions prevented him from actually observing the sign, the area was restricted. Given that Prather did not dispute the evidence that the sign was posted, and that he still proceeded to enter a clearly delimited area, we conclude that the trial court correctly found that reasonable minds could only find that he was a trespasser.

*Id.* at *3.

{¶ 23} Upon review, we find *Prather* distinguishable. As a threshold matter, this court interpreted the version of R.C. 955.28(B) then in effect as providing an affirmative defense for both civil and criminal trespass. The present version of the statute unambiguously limits the defense to criminal trespass. But even setting aside that

distinction, *Prather* is distinguishable on its facts. *Prather* involved a delivery driver's entry into a fenced, residential yard with a no-trespassing sign. Here Gillespie entered a building that housed the appellees' commercial business office. Paul Thies admitted that the exterior door in fact may have said "office" on it. Gillespie testified that once inside the building he opened one door (which on the record before us could have been the office) and was bitten by a dog. Although the appellees contend the dogs were deeper in the building behind a workshop door that had a warning sign in the window, Gillespie's testimony suggests that the dogs were not in the workshop. But even if Gillespie did open the workshop door, he testified that the vestibule where he stood was dark and that the only light was coming from the other side of the door. Unlike *Prather*, then, a trier of fact could find that the warning sign was not reasonably visible and did not provide adequate warning.

{¶ 24} Based on the reasoning set forth above, we sustain Gillespie's assignment of error and reverse the trial court's entry of summary judgment against him on his strict-liability claim under R.C. 955.28(B). The matter is remanded to the trial court for further proceedings consistent with this opinion.

. . . . . . . . . . . . .

FROELICH, J. and TUCKER, J., concur.

Copies mailed to:

David E. Davidson
James D. Utrecht
Hon. Jeannine N. Pratt